UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

**DANIEL GEHRINGER,**

**Plaintiff,**

v.   4:12-cv-77

**ST. JOSEPH'S/CANDLER HEALTH SYSTEM, INC.,**

**Defendant.**

## ORDER

### I. INTRODUCTION

Daniel Gehringer alleges that St. Joseph's/Candler Health System Inc. ("Defendant") violated Title VII of the Civil Rights Act of 1964 ("Title VII"), by (1) discriminating against him on the basis of his male gender; and (2) retaliating against him for internally reporting gender discrimination and filing a claim with the Equal Employment Opportunity Commission ("EEOC"). *See* ECF No. 1. Before the Court is Defendant's Motion for Summary Judgment. ECF Nos. 5; 21. Because Gehringer fails to establish a *prima facie* case of discrimination or retaliation, the Court **GRANTS** Defendant's motions. ECF Nos. 5; 21.

### II. BACKGROUND

On May 16, 2001, Defendant hired Gehringer as a Nuclear Medicine Technologist ("NMT") in the Nuclear Medicine Division of the Imaging Department for Defendant's Candler campus. *See* ECF Nos. 26 at 3; 27 at 80-81, 84-85; 22 at 1. As an NMT at Candler, Gehringer performed nuclear medicine scans, but he never performed computed tomography ("CT") scans, magnetic resonance imaging ("MRI") scans, mammograms, or breast ultrasounds. *See* ECF Nos. 27 at 90-93; 22 at 1-2. Throughout his employment at Candler, no one ever asked Gehringer to perform a CT scan, MRI scan, mammogram, or breast ultrasound. ECF No. 27 at 91-92. Gehringer never applied for any position that would require him to perform CT scans, MRI scans, mammograms, or breast ultrasounds. *Id.* Gehringer received positive performance reviews throughout his years working for Defendant, the last of which was a letter of recommendation from his supervisor, Laura Gleaton, in February 2010. *See* ECF Nos. 26 at 5-7; 28 at 18-41.

On May 25, 2009, Gehringer sent an email to Jeff Zehel, Director of Imaging Services, notifying Zehel that Gehringer "would like to work on [his] CT certification," and inquiring whether Gehringer could "cross-train" so that he could "sit for the CT boards." ECF No. 24-4 at 28. Zehel denied Gehringer's request to cross-train. ECF No. 27 at 153. Zehel informed him that cross-training was no longer allowed because of liability issues, and that individuals who wanted to learn a new technical skill must enroll in an approved program. *Id.* Subsequently, Gehringer enrolled in a program at Armstrong Atlantic State University. *Id.* at 42.

On July 16, 2010, Gehringer sent an email to Zehel and Doreen Chery, Corporate Compliance Officer, complaining that Suzanne Spivey, a life care manager who

oversaw the CT department, was being allowed to "cross train[] in CT to get her exams in so she [could] sit for the registry." ECF No. 24-4 at 29. Gehringer inquired, "why is it that she can now cross train in on the clock and I was told I could not unless in an approved program? I think she should have to go through a bridge program like you . . . said I had to do in order to cross train." Id. Gehringer also asked Chery to "check to see if discriminated conflicts exist [sic]," and concluded by stating "I hope this can be kept quiet." Id.

On July 19, 2010, Zehel responded that he did "not consider this to be a cross training issue at all" because "Spivey ha[d] 17 years of experience as a CT technologist," so this training was "within her scope of practice." Id. Zehel further explained that it was necessary for Spivey to keep her CT "skill set up to date" since CT was "one of the areas she manage[d]." Id.

This explanation failed to satisfy Gehringer. He wrote Zehel back later that day complaining that he also had "15 years of experience in CT," and that he did not "think that it is in her scope of practice" because "[m]any managers manage without being certified in the . . . fields they manage. Id. However, Gehringer did admit in another email he sent to Zehel shortly thereafter that "I agree that a manager that is certified in the modality that they manage will do a better job of managing that modality." Id. at 31. Gehringer stated that he understood employees "would want to take the easy way and cheap way to certification. I wanted to also. . . . I just want to be treated fairly and with the same respect, rights, and fairness that any of my co-workers are treated." Id.

Within an hour of that email, Chery responded to Gehringer informing him that she was working on the matter and needed to get some more information to "assure that [he was] being treated fairly." Id. at 30. She also instructed Gehringer to "keep this confidential [because] [a]s with all potential compliance or human resources matters, it is not appropriate to discuss this matter outside the people involved (Dan, Jeff, and me at this point)." Id.

The next day, July 20, 2010, Gehringer responded to Chery that "[i]t will be hard to contain this when so many are already talking about this," and then stated "I really don't want to meet on this issue. . . . Doreen just decide. . . . I am not going to sue the company on any decision. . . . End of discussion." Id. The following morning, Gehringer again emailed Chery stating that he "just so happen[ed] to have dinner last night with an attorney friend" who was "confused why the company would risk a lawsuit." Id. at 33

On July 29, 2010, Chery and Zehel met with Gehringer to discuss his concerns regarding the cross-training issue, as well as other concerns raised by Gehringer. See id. at 35-39. Chery again explained to Gehringer that although she "realize[d] he sees this issue as one of female vs. male and that the females seem to be cross training where he isn't" Chery did not see it that way. Id. at 37. Chery saw "it as a 1) CT tech, turned manager [Spivey], then refreshing her skills; 2) certified radiology tech [Shalonda Smith, another employee

2

Gehringer complained about] performing mammography procedures in advance of her transfer to that dept . . . ; 3) vs. Nuc Med Tech [Gehringer] who wants to cross train into CT – an area he was not hired for and outside the scope of his duties/certification." *Id.* Chery concluded the meeting by going over the emails that Gehringer had sent her in the previous weeks, highlighting statements she felt were disrespectful, harassing, and inappropriate, and reminding him that his manager, Laura Gleaton had already "talked with him about a similar matter – that his co-workers felt harassed by him because of the way he wrote his emails." *Id.* at 38-39. Gehringer "apologized and said he didn't mean for them to come across that way." *Id.* at 39. Gehringer also told Zehel and Chery that he would be filing a discrimination complaint with the EEOC. ECF No. 27 at 185-86, 204-05.

At the same time that Gehringer was complaining to Zehel and Chery about the cross-training issue, Gehringer's co-workers began complaining to Tammy Aveille, of Human Resources, about Gehringer. On July 20, 2010—the same day that Gehringer told Chery that it would be hard to contain the cross-training matter because so many people were already talking about it—Aveille received a complaint from Spivey that Gehringer was harassing her and making inappropriate comments about Spivey to her subordinates in violation of the Co-Worker Compact. ECF Nos. 24-4 at 46; 31 at 20-49. Aveille investigated this complaint, and three CT/MRI employees corroborated the events described by Spivery. ECF No. 24-4 at 46. That same day, Chery contacted Aveille to report that Gehringer was claiming discrimination and telling co-workers, "I've got them now." *Id.*; ECF No. 31 at 59-60. The following day, two more CT/MRI employees contacted Aveille complaining that Gehringer made more disruptive statements. ECF Nos. 24-4 at 47; 31 at 61-64.

Even after Gehringer's meeting with Chery and Zehel on July 29, 2010, Aveille continued receiving complaints about Gehringer. On August 4, 2010, Spivey once again complained to Aveille that Gehringer was still discussing his cross-training complaint with one of her CT Technologists. ECF No. 24-4 at 47. On August 12, 2010, Gleaton informed Aveille of yet another complaint about an inappropriate comment Gehringer made to a NMT. *Id.* at 49. On August 24, 2010, a student intern complained that Gehringer engaged in disruptive conduct that upset the intern. *Id.* at 51-62.

It was also on August 24, 2010 that Gehringer filed a charge of discrimination with the EEOC alleging that Defendant discriminated against him on the basis of sex and disability by allowing two female managers "to cross-train for the CT," but denying his "request[ for] the same opportunity" and instead requiring him to "complete a bridge program in college for CT certification." ECF No. 6-1 at 2. Human Resources stamped the EEOC Notice of Charge of Discrimination as "received" on September 3, 2012. *Id.* at 1.

On September 2, 2010—the day before human resources received the EEOC Notice of Charge of Discrimination by Gehringer—

3

Donald Stubbs, Jan Brown, Aveille, Chery, Zehel, Gleaton, Vivian Austin, and Mark McDermott, Defendant's attorney, held a meeting to discuss the many issues involving Gehringer. ECF No. 22 at 6. During the September 2, 2010 meeting, the decision was made to terminate Gehringer's employment. *Id.* at 6-7. The termination letter, dated September 22, 2010, stated that Gehringer performed his job well and for the most part exhibited good patient care over the years, and that these two factors delayed the termination decision. ECF No. 27-1 at 100. But the letter continued by identifying some of the general reasons why Defendant terminated Gehringer, including Defendant's beliefs that:

- Gehringer "alienat[ed] every supervisor, human resources representative, and administrator who tried to assist" him with his myriad of complaints over the years;
- Defendant "determined that it is just not possible to manage [Gehringer];" and
- Gehringer was disruptive; intimidated co-workers; was not a team player; did not have the best interest of the System at heart; his managers and co-workers did not trust him; his conduct in the workplace was oftentimes inappropriate; and he had a history of behavior that violated the System's policies and Co-worker Compact;

*Id.* The letter then recited a non-exhaustive list of specific examples of Gehringer's misconduct. These examples are legion, and include, but are not limited to:

- Multiple past written warnings, including a 2003 "Written Counseling for Harassment . . . for creating an undesirable work environment for all of [his] co-workers in the Nuclear Med Department. . . . [with] instruct[ions] to immediately stop the behavior";
- Multiple instances of workplace gossip;
- Disparaging remarks to co-workers about "black people" and "people who grew up in trailer parks";
- Advising a co-worker to frivolously pull "the discrimination card" against Defendant, and constantly threatening to co-workers the he would obtain legal counsel and sue for discrimination;
- Making numerous inappropriate sexual comments and advances toward many co-workers and patients;
- Multiple emails from Gehringer to supervisors perceived by Defendant to be disrespectful or inappropriate, including one telling a manager, "I don't think you should comment on things you don't understand," and the email to Chery on July 20, 2010 about his cross-training complaint demanding that she "just decide . . . End of discussion"; and
- On August 24, 2010, presenting a "distorted version of a comment and inquiry made by a student," thereby causing "unnecessary disruption in the work environment".

*Id.* at 100-02.

4

On September 27, 2010, Defendant terminated Gehringer's employment. ECF No. 24-4 at 68. The next day, Gehringer filed another charge with the EEOC alleging that Defendant unlawfully "discharged [him] in retaliation for previously filing [his] EEOC Charge [on August 24, 2010]." ECF No. 6-3 at 2-3.

### III. ANALYSIS

The Court first sets for the appropriate standard of review. Next, the Court analyzes Gehringer's discrimination claim. The Court then addresses his retaliation claim.

#### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on summary judgment, the Court views the facts and inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437 (11th Cir. 1991).

"The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The nonmoving party then "may not rest upon the mere allegations or denials of [his] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294 (11th Cir. 1998). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material only if it might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248.

#### B. Gender/Sex Discrimination

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . or . . . to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1)-(2). A plaintiff may establish a claim of Title VII discrimination through either direct or circumstantial evidence. *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005). "Direct evidence is 'evidence, which if believed, proves existence of fact in issue without inference or presumption.'" *Ekokotu v. Boyle*, 294 F. App'x 523, 525 (11th Cir. 2008) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997)). Gehringer has not presented direct evidence of sex discrimination.

5

"Lacking direct evidence, [Gehringer] must prove [his] sex discrimination claim circumstantially." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Gehringer "must first establish a prima facie case of discrimination;" this is typically achieved "by showing that [he] was a qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside the protected class." *Id.* But, "[t]he methods of presenting a prima facie case are flexible and depend on the particular situation." *Id.*

If Gehringer makes the required showing to establish a *prima facie* case of discrimination, "a rebuttable presumption arises that the employer has acted illegally." *Id.* Defendant must then rebut that presumption by proffering "one or more legitimate non-discriminatory reasons for its action." *Id.* If Defendant does so, Gehringer must "produce evidence that the employer's proffered reasons are a pretext for discrimination." *Id.* Regardless of presumptions, the ultimate burden lies with Gehringer to show that Defendant intentionally discriminated against him. *See United States v. Crosby*, 59 F.3d 1133, 1135 (11th Cir. 1995).

Defendant first argues that Gehringer fails to establish a *prima facie* case of discrimination because Defendant's denial of his request to cross-train—on which his entire discrimination claim rests—was not an adverse employment action. *See* ECF No. 23 at 12-13. Gehringer responds by simply restating his complaint that "[t]he adverse action was the denial of the opportunity to train on the CT scanner and similarly situated female employees were permitted to cross-train."[1] ECF No. 26 at 24.

Gehringer bears the burden of establishing an adverse employment action. *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1246 (11th Cir. 2001). But "not all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action." *Id.* at 1238.

To establish an adverse employment action under Title VII, "an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* "[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* Courts in this Circuit, as well as sister circuits, have consistently held that a "denial of training, without more, does not constitute and adverse employment action." *Fitzhugh v. Topetzes*, No. 1:04-cv-3258, 2006 WL 2557921 at *7 (N.D. Ga. Sept. 1, 2006); *see also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 n.16 (11th Cir 1998); *Clegg v. Arkansas Dept. of Correction*, 496 F.3d 922 (8th Cir. 2007).

Gehringer fails to make the required showing of an adverse employment action. He does nothing more than offer the conclusory assertion that, having permitted similarly situated female employees to cross-train, Defendant's denial of his request to cross-train constituted an adverse

---

[1] The Court notes that Gehringer's brief in opposition to Defendant's motion for summary judgment provides sparse record cites throughout and virtually no case law except for that outlining the relevant, general legal standards.

6

employment action. Case law makes clear, however, that something more is required.

In *Harvey v. City of Bradenton*, the court held that an employer's denial of the plaintiff's training requests for several months was not an adverse employment action because the denials did "not affect Plaintiff's salary, title, position, or job duties . . . [and the plaintiff presented no] evidence that the training denied was an important condition of employment." No. 804CV1748TEAJ, 2005 WL 3533155, at *5 (M.D. Fla. Dec. 22, 2005); *see also Fitzhugh*, 2006 WL 2557921 at *7 (finding no adverse employment action and where employee failed to show that denial of training affected her "salary, title, position, or job duties").

Like the plaintiffs in *Harvey* and *Fitzhugh*, Gehringer fails to demonstrate—or even allege—that the denial of training affected his salary, title, position, or job duties. By Gehringer's own admission, his job never required him to perform CT scans. Cross-training on the CT scanner was simply not necessary for Gehringer's position, and therefore, not an important condition of his employment. ECF No. 27 at 90-93. He has not carried his burden. The denial of his cross-training request was not an adverse employment action.

Moreover, any speculation by Gehringer that denial of his cross-training request prevented him from being able to advance in his employment with St. Joseph's is unavailing. In addition to being pure speculation (Gehringer has never shown that he was expected to work on the new CT machine that Defendant was acquiring, nor can he possibly show that he would have passed his CT boards), Gehringer never claims that he applied for or was denied a promotion or position that would require him to perform CT scans. *See Higgins v. Gonzales*, 481 F.3d 578, 586 (8th Cir 2007), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) ("[A]lthough [plaintiff] makes the bald assertion of being denied training which would have contributed to [a] promotion . . . she fails to allege ever being denied a promotion . . . because of a lack of training."); *Denson v. City of College Park*, No. 1:07-cv-1624, 2009 WL 302192 at *16 n.18 (N.D. Ga. Feb. 5, 2009) (holding that employee's claims that supervisor's actions "impacted the potential for future promotion opportunities is too speculative to constitute an adverse employment action" because employee never applied for an available position) (citing *Davis*, 245 F.3d at 1239).

Having failed to make the required showing of an adverse employment action, Gehringer's Title VII sex discrimination claim fails as a matter of law. Out of an abundance of caution, however, the Court also addresses Defendant's arguments that Gehringer fails to satisfy the third prong of his *prima facie* case because he offers no proper comparators to which he is similarly situated, ECF No. 23 at 15-16, and that even assuming Gehringer could establish a *prima facie* case of gender discrimination, he cannot point to any evidence establishing that Defendant's proffered legitimate, non-discriminatory reasons for denying his cross-training request are pretextual." ECF No. 23 at 17.

Gehringer maintains that he has offered similarly situated comparators because he was told he could not cross-train on CT for liability reasons—not because he was not a manager who did not need to perform CT scans for his job—and since the females who were permitted to cross-train were, like him, not certified on the CT scanner, the same liability issues would apply. *See* ECF No. 26 at 24.

"A comparator is an employee similarly situated to the plaintiff in all relevant respects." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008) (internal quotation omitted). "Although a comparator need not have the same job title as the plaintiff to be a sufficient comparator, material differences in 'ranks and responsibilities' may render any comparison impossible without 'confusing apples with oranges.'" *Horn v. United Parcel Services, Inc.*, 2011 WL 2650858, at *4 (11th Cir. July 7, 2011) (citing *Rioux*). Gehringer must be "matched with a person or persons who have *very similar job-related characteristics* and who are in a *similar situation. Wehunt v. R. W. Page Corp.*, 352 F. Supp. 2d 1342, 1351 (M.D. Ga. 2004) (citing *MacPherson v. Univ. of Montevallo*, 922 F.2d 766, 774 (11th Cir. 1991)).

In *Wehunt*, the court held that a newspaper's Sunday projects editor was not a valid comparator to its local news editor because the "job-related characteristics of [their] positions were not" substantially similar. 352 F. Supp. at 1351. The *Wehunt* court stressed that even though both employees were news editors who reported to the same supervisor, their job duties were not substantially similar. *Id.* at 1351-52. They dealt with different types of news and had different duties and responsibilities. Specifically, one dealt with daily local news, the other dealt weekend specials; one supervised assistant editors and local reporters, the other did not; and one edited two other columnists, the other did not. *Id.*

Gehringer never clearly identifies the "uncertified female employees" to whom he purports to be similarly situated, ECF No. 26 at 24, but based on his deposition, he apparently offers five female comparators— Suzanne Spivey, Cheryl Rawlings, Shalonda Smith, Kelly Andrews, and Ranae Young. ECF No. 27 at 223-235. At Gehringer's deposition, however, when asked whether Spivey, Rawlings, Smith, or Andrews had the same duties as him, Gehringer admitted, "No, they were not nuclear medicine techs." ECF No. 27 at 231-32. Gehrigner also admits that Young merely worked on an "as needed" basis, had a different manager than him, and that any cross-training that she was allowed was approved by that different manager in 2006, years before Defendant's 2009 decision to nix cross-training altogether, allegedly for liability reasons. *Id.* at 227-228. Moreover, by failing to properly controvert the facts set forth in Defendant's Rule 56.1 Statement of Material Facts, Gehringer admits to the job titles and duties of these women described by Defendant in its Rule 56.1 Statement of Material Facts. *See* ECF No. 22 at 3, 5; *see also* S.D. Ga. L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.").

Gehringer fails every step along the way to offer evidence showing that any of the proffered female comparators are similarly situated to him. To the contrary, the record shows that none of these women are sufficiently similar to Gehringer in virtually any relevant respect. They all have different positions, titles, responsibilities, and job duties than Gehringer. Like the employees in *Wehunt*, most of them share the same manager with the plaintiff—Young did not even have that in common with him—but also like in *Wehunt*, the similarities end there.

Spivey and Rawlings were managers who obviously had different duties than Gehringer. Smith performed mammography procedures, attended a breast ultrasound program, and was transferring to a different position; Gehringer has never performed such procedures during his employment with Defendant, and was not transferring to any new position. Andrews received CT training during school and was hired in the CT/MRI division; Gehringer worked in a different division and has never been asked to perform CT scans during his employment with Defendant. And, unlike Gehringer, Young was an "as needed" employee with a different manager who has certainly never cross-trained in CT since 2006, if ever. If fact, Gehringer's attempt to identify a similar situated comparator is substantially weaker than the plaintiff's attempt to do so in *Wehunt*.

Because of the strict standard that a comparator be "similarly situated" in "all relevant respects," all of the female employees identified by Gehringer differ too much in their positions, titles, duties, and responsibilities to meet such a standard and qualify as similarly situated employees.

Gehringer's failure to show the existence of a similarly situated employee does not mean that Defendant is automatically entitled to summary judgment, *see Wilson*, 376 F.3d at 1092; *see also Rioux*, 520 F.3d at 1277, but such failure does make "summary judgment appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Gehringer presents no other evidence of discrimination. His entire discrimination claim boils down to a conspiracy theory based on his own speculation, but not on personal knowledge. *See* ECF No. 27 at 149. And when questioned how female managers went about preventing him from cross-training, Gehringer admits, "I don't know what they did." *Id.* at 151.[2]

To be sure, Gehringer is unhappy with Defendant's denial of his cross-training request and disagrees with Defendant's

---

[2] Moreover, it is undisputed that Gehringer actually made his cross-training request with Zehel, the male, Director of Imaging Services, and it was Zehel who, based on the advice of hospital attorney McDermott (another male), denied Gehringer's request. *See* ECF Nos. 22 at 3-4; 24-4 at 29; 27 at 153. The fact that Zehel and McDermott are the same gender as Gehringer does not presumptively preclude the finding of a Title VII violation, but Gehringer "faces a greater burden." *See Moore*, 137 F. App'x at 239 n.4; *United States v. Crosby*, 59 F.3d 1133, 1135 n.4 (11th Cir. 1995) (implying need for evidence that decision-maker "held members of his own [class] to a higher standard of conduct than members of another [class]"); *Billingsley v. Jefferson Cnty.*, 953 F.2d 1351, 1353 (11th Cir. 1992); *Robinson v. UPS, Inc.*, 2007 WL 3484743, at *5 (N.D. Ga. Nov. 14, 2007) ("When the decision-maker is in the same class as the plaintiff, it is very difficult to show a discriminatory motive.").

decision. But Gehringer must do more than "simply quarreling with the wisdom of" Defendant's reasons for its decision. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). "Title VII does not prevent an employer from interpreting its rules as it chooses and making its determinations as it sees fit under such rules." *Moore v. Ala. Dep't of Corrections*, 137 F. App'x 235, 239 (11th Cir. 2005). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead [the court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Gehringer fails to present evidence that Defendant's denial of his cross-training request was motivated by any discriminatory animus.

Indeed, even if Gehringer could establish a *prima facie* case of sex discrimination, Defendant's reason for denying his cross-training request—that it generally does not allow cross-training; that CT scans were not within the scope of his job duties; and that his performance of CT scans created potential liability issues—meets its "exceedingly light" burden of production at the rebuttal stage. *See Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *9 (S.D. Fla. July 25, 2011) (quoting *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). Gehringer makes no argument attempting to demonstrate that Defendant's proffered reasons are pretextual, *see* ECF No. 26, and no evidence of pretext exists in the record.

Because Gehringer fails to show that the denial of his cross-training request was an adverse employment action, fails to present a similarly situated employee as a comparator, and also fails to introduce other evidence indicating or inferring sex discrimination, summary judgment as to his Title VII discrimination claim is appropriate.

Accordingly, Defendant's motion for summary judgment on the sex discrimination claim is **GRANTED**. The Court now turns to Gehringer's retaliation claim.

### C. Retaliation

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).

"To make a prima facie showing of retaliation, [Gehringer] must show: (1) that [he] engaged in statutorily protected conduct; (2) that [he] suffered adverse employment action; and (3) that there is 'some causal relation' between the two events." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010).

If Gehinger establishes a *prima facie* case, Defendant "must proffer a legitimate, non-discriminatory reason for the adverse employment action." *Holifield*, 115 F.3d at 1566. "If [Defendant] offers legitimate reasons for the employment action, [Gehringer] must then demonstrate that

[Defendant's] proffered explanation is a pretext for retaliation." *Id.*

Defendant first argues that any retaliation claim based on Gehringer's alleged internal complaints to St. Joseph's management in July and August 2010 are barred because he did not include those complaints in his September EEOC retaliation charge. *See* ECF Nos. 5; 23 at 18-19. Gehringer believes this argument is without merit because when he filed his August EEOC discrimination charge, the September 2, 2010 meeting of management had not occurred yet and he was also unaware of what he describes as Chery and Aveille's discriminatory investigation of him. ECF No. 26 at 21. Defendant points out that the issue is whether Gehringer knew about—and failed to include—his own internal complaints when he filed his September retaliation charge, not whether he lacked knowledge of Defendant's investigation and meeting when he filed his August discrimination charge. ECF No. 35 at 5.

Before "filing a Title VII action . . . a plaintiff first must file a charge of discrimination with the EEOC." *See Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004). Gehringer's complaint must be "limited to the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985). "[J]udicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but [the Eleventh Circuit has] also warned that 'allegations of new acts of discrimination are inappropriate.'" *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 926 (11th Cir. 2010) (citing *Gregory*, 355 F.3d at 1279-80) (internal quotations omitted).

Gehringer did file the EEOC charges without the assistance of counsel so his allegations will be "liberally construed." *Cotton v. G.S. Dev.*, 390 F. App'x 875, 877 (11th Cir. 2010). And "[c]ourts are . . . extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *Gregory*, 355 F.3d at 1280 (internal quotation omitted). Gehringer, however, cannot fill in that blank with an unlimited number of specific discriminatory acts. In order to be sufficient, his September charge must include "factual information in the charge that discloses the factual basis for the retaliation claim." *Houston v. Army Fleet Servs., L.L.C.*, 509 F. Supp. 2d 1033, 1043 (M.D. Ala. 2007) (citing *Gregory*, 355 F.3d at 1277). The Court in *Thomas v. Miami Dade Pub. Health Trust* barred the plaintiff from alleging retaliatory acts not mentioned in her EEOC charge, even where she had checked the retaliation box and listed two specific retaliatory acts. 369 F. App'x 19, 22-23 (11th Cir. 2010).

On September 28, 2010, Gehringer filed a charge with the EEOC alleging that Defendant unlawfully "discharged [him] in retaliation for previously filing [his] EEOC Charge [on August 24, 2010]." ECF No. 6-3 at 3. That September charge made no allegation that Defendant retaliated against him for making internal complaints of gender discrimination. Neither of Gehringer's EEOC charges make any mention whatsoever of internal complaints. But in his Complaint in this case, Gehringer

11

asserts that Defendant retaliated against him for filing a complaint with the EEOC *and* for internally reporting gender discrimination. ECF No. 1 at 9.

Gehringer's internal complaints of gender discrimination occurred in July and August of 2010—before he filed his September EEOC charge—and thus should have been included in his charge. His attempt to include a retaliation claim based on internal reports of discrimination is an attempt to include an additional retaliation claim that was not included in his September EEOC charge. It is based on new factual information that does not "amplify, clarify, or more clearly focus the allegations in the EEOC complaint," but instead inappropriately attempts to allege new acts of retaliation. Thus, Gehringer is barred from pursing a retaliation claim based on his internal reports of gender discrimination. *Id.* at 22-23.

But Gehringer does state that when Zehel and Chery met with him on July 29, 2010 and disagreed with him about whether the denial of his cross-training request was discrimination, he "told both of them at that time that [he] was going to file a complaint with the EEOC." ECF No. 27 at 185-86, 204-05. Gehringer also states that at the "middle to the end of August," "[j]ust before" he filed his August EEOC charge, he met with Defendant's Chief Operating Officer Greg Harb and told him that he was "going to go to the EEOC and file a discrimination claim." *Id.* at 205-07. Harb responded that that was Gehringer's right, and he would not be fired for it. *Id.* at 206-07.

These threats of filing an EEOC charge are not internal reports of gender discrimination that Gehringer failed to include in his September retaliation charge. Rather than being new allegations of discrimination, they "amplify, clarify, or more clearly focus the allegations in [Gehringer's September] EEOC complaint," and could "reasonably be expected to grow out of the charge" that Defendant retaliated against him for filing his August EEOC charge.

Accordingly, insofar as Defendant requests summary judgment in its favor on Gehringer's claim that Defendant retaliated against him for reporting internal complaints of gender discrimination, ECF Nos. 5, the motion is **GRANTED**. But Gehringer may rely on his statements to Zehel, Chery, and Harb that he was going to file an EEOC charge as a basis for his claim that Defendant retaliated against him for previously filing his August EEOC charge.

Next, Defendant argues that Gehringer cannot establish a *prima facie* case of retaliation based on his August EEOC charge. *See* ECF No. 23 at 19. Defendant states that because it had no knowledge of Gehringer's August EEOC charge—of which it received notice on September 3, 2010—when it decided to terminate Gehringer on September 2, 2010, Gehringer cannot possibly state a *prima facie* case of retaliation based on the actual filing of the August charge. *Id.* at 19-20. The Court agrees.

To establish causation, Gehringer must show that the retaliators *were aware* of his protected activity and that the "protected

12

activity and the adverse action were not wholly unrelated." *Porter v. Am. Cast Iron Pipe Co.*, 427 F. App'x 734, 737 (11th Cir. 2011). Gehringer cannot show such awareness because (1) it is undisputed that Defendant made the decision to terminate Gehringer on September 2, 2010, a day *before* Defendant received notice of Gehringer's EEOC filing; and (2)Gehringer admits that he has no personal knowledge that anyone who made the decision to terminate him knew that he filed the August 24 EEOC charge. ECF No. 27 at 271. *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002) (finding no retaliation where decision-maker did not contemporaneously know about the protected activity); *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct.").

For the same reason, Gehringer's mid-to-late August statement to Harb that he was going to file and EEOC charge cannot support his retaliation claim. It is undisputed that the decision-makers at the September 2, 2010 meeting did not know about this statement because Harb was not involved in that meeting. *See* ECF No. 22 at 6. The Court cannot assume that Harb told any of the decision-makers about Gehringer's statement, and there is no evidence suggesting that Harb told anyone about the statement. *See Clover v. Total System Servs. Inc.*, 176 F.3d 1346, 1355 (11th Cir. 1999) ("[B]ecause 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that [the assistant vice president of the employer's human resources management division] actually told [the decision-maker] about [the employee's actions]."). In fact, the unrebutted testimony is that no one at the meeting knew about Gehringer's EEOC charge or his threat to Harb that he was going to file a charge. *See* ECF Nos. 28 at 54-55; 30 at 39; 31 at 93.

Gehringer's retaliation claim—and the Court's analysis—however, does not end there. Even though, at the time it decided to terminate him on September 2, 2010, Defendant had no knowledge that Gehringer had actually filed an EEOC charge or that he told Harb that he was going to file a charge, Defendant did know, for purposes of summary judgment, that Gehringer had told Zehel and Chery on July 29, 2010 that he was going to file an EEOC charge. *See* ECF No. 27 at 185-86, 204-205.

Defendant argues that Gehringer cannot show a causal connection between his July threat to file an EEOC charge and his termination because his own intervening numerous instances of misconduct actually caused his termination and destroyed any inference of retaliatory intent created by the relatively short lapse of time. *See* ECF No. 23 at 20-21. Defendant ends by arguing that even assuming *arguendo* that Gehringer can establish a *prima facie* case of retaliation, Defendant has set forth a litany of legitimate, non-discriminatory reasons for his termination, and he has not demonstrated that each of these reasons was pretext. *Id.* at 21-24.

Gehringer concludes that "[a]n inference can be drawn that the close proximity between the threatened . . . EEOC charge and the termination supports that the [threat] of the charge and the termination were not completely unrelated." ECF No. 26 at 23. He attempts to show pretext by speculating that a conspiracy to fire him was afoot. *See Id.* at 10-13, 17-18, 20. He points to his past, positive performance evaluations and states that Gleaton was unaware of any problems concerning his manageability or strained relations with co-workers, noting that she even wrote him a letter of recommendation in February 2010. *Id.* at 19-20.

Gehringer also argues that Defendant's reasons for terminating him are "a list of things that have been known to the defendant for years which did not cause his termination for the first nine years of his employment and a list of items that were generated by the retaliatory investigation." *Id.* at 19. Gehringer further claims that the investigations that resulted in his termination were not conducted in accordance with hospital policy and that Defendant dispensed with progressive discipline. *Id.* at 20.

It is undisputed that Gehringer received positive performance reviews during his employment, but this argument misses the point since he was not terminated for poor performance. The termination letter specifically stated that Gehringer performed his job well and for the most part exhibited good patient care over the years, and that these two factors delayed the termination decision. ECF No. 27-1 at 100. Moreover, Gehringer actually did receive written warnings for misconduct in the past that stated that any further incidents would result in disciplinary action, up to and including termination. ECF Nos. 24-3 at 42-45; 24-4 at 2-4. Gehringer in fact fails to provide the hospital policy that he claims Defendant did not follow. In addition, the evidence shows that management, including Gleaton, had no knowledge of the volume and extent of Gehringer's misconduct until it came to light in the weeks leading up to his termination. ECF Nos. 28 at 58-64; 24-4 at 46-49.

Therefore, Gehringer's arguments based on past positive performance and Defendant's allegedly suspicious decision to suddenly disregard progressive disciple and terminate him after ignoring similar misconduct in the past are unavailing. *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 (11th Cir. 2004) (affirming grant of summary judgment for employer and rejecting employee's pretext argument that was based on, among other things, alleged "abrupt change in [supervisor's] opinion of her performance, the lack of any convincing explanation for the sudden negative view of her performance, [and] the lack of any meaningful opportunity for her to improve any perceived deficiencies in her performance. . . ."); *Blair v. Atlanta Gastroenterology Assoc.*, 2007 WL 2001769 at *9-10 (N.D. Ga. July 3, 2007) ("[W]here an employer provides legitimate reasons for more recent negative reviews, mere evidence of past good performance does not demonstrate that the employer's legitimate non-discriminatory reasons cannot be believed.").

Gehringer argues that his termination occurred under suspicious circumstances,

particularly the fact that multiple co-workers would suddenly call and complain to Aveille about him on the same day that he complained to Chery about the cross-training issue. *See* ECF No. 26 at 17. He also attempts to paint Chery and Aveille's investigations as some kind of orchestrated effort to oust him from his job. *See id.* at 10-13, 17-18, 20. Aside from there being nothing suspicious about Aveille beginning to receive complaints that Gehringer was complaining to co-workers about the cross-training issue that day since that was the same issue he was also complaining to Chery about, this Court cannot find a genuine dispute of material fact based on nothing more than Gehringer's empty speculation. *See Clover*, 176 F.3d at 1355 (finding that "reasonable inferences from the evidence, not mere speculation," are required to create a jury issue).

What is undisputed is that multiple co-workers did complain to Aveille about Gehringer on July 20, 2010, and more co-workers continued to complain about him in the weeks that followed. The testimony of Aveille and Chery also reveals no evidence of a conspiracy between them to get Gehringer terminated. The Court will not accept Gehringer's invitation to find genuine disputes of material fact based on unsubstantiated conspiracy theories.

In the end, Gehringer is left with nothing to fall back on except for the relatively close temporal proximity between his July 29, 2010 threat to file an EEOC charge and his termination. The rest of his case devolves into conspiracy theories based on pure speculation. Although it is true that close temporal proximity can, in some cases, establish a *prima facie* Title VII case, this is not such a case.

"[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." *Hankins v. AirTran Airways, Inc.*, 237 F. Appx. 513, 520 (11th Cir. 2007). Absent additional evidence of causation, "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be very close." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (internal quotation omitted). Even if an inference of causation might otherwise be raised by a short lapse in time between knowledge of a protected activity and adverse action, "such an inference does not arise when intervening factors are established." *Spence v. Panasonic Copier Co.*, 46 F. Supp. 2d 1340, 1348 (N.D. Ga. 1999).

In *Hankins*, the plaintiff argued that causation could be established based on close temporal proximity because she was terminated twenty days after reporting racial bias to her employer. 237 Fed. Appx. at 520. The court, however, held that no such causation could be inferred because five days after reporting racial bias, the plaintiff yelled at and threatened a co-worker, and "[t]his intervening act of misconduct, which was plainly in violation of [the employer's rules] severed the causal connection." *Id.*

Similarly, in *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, the court held that even though the plaintiff engaged in protected activity less than two weeks before the adverse employment action, no

15

causal connection existed because the evidence showed that the dismissal was actually caused by "a culmination of problems growing out of appellant's manner of handling his job, his lack of cooperation within his office," and other misconduct. 632 F.2d 1325 (5th Cir. 1980).[3]

Gehringer offers nothing more than a temporal proximity of over one month in his attempt to show a causal relationship, and he suffers under the crushing weight of multiple reports of misconduct on his behalf that either occurred after July 29, 2010, or were first learned by Defendant after that date. Aveille received an August 4, 2010 complaint from Spivey that Gehringer continued to complain to co-workers about not being allowed to work in CT when Spivey and Rawlings were allowed to. ECF No. 24-4 at 47. Aveille received multiple complaints on August 10, 2010 that Gehringer continued to complain to co-workers about the cross-training issue; gossiped to a group of co-workers that he saw a Doctor performing oral sex on a man at a Christmas party; advised another employee who was tardy a lot to work to frivolously "pull the discrimination card" against Defendant because she was pregnant and dating a black man; gossiped to a co-worker that another co-worker showed his penis to Gehringer; offended co-workers by telling a group of them that "[p]eople who grew up in trailer parks do not need to visit downtown because they don't know how to conduct themselves"; told a co-worker while attended a birthday party that she better not let Gehringer follow her significant other "to the bathroom or [she] will never see him again"; told another co-worker, upon seeing a picture of her and her husband, that he would "do both of [them]." ECF Nos. 24-4 at 47-49; 27-1 at 101. Many of these complaints were corroborated by multiple employees. See ECF No 24-4 at 47-49. Finally, Defendant also received a report that on August 24, 2010, Gehringer distorted a student's comment, intimidating the student and causing unnecessary disruption in the work environment. ECF No. 27-1 at 101.

This long list of misconduct is more than enough to sever any causal connection between Gehringer's July 29, 2010 threat to file an EEOC charge and his termination. Although Gehringer denies these multiple incident of misconduct, see ECF No. 27 at 103-44, he provides no evidence that Defendant did not honestly believe that they occurred. Gehringer admits that he does not know what Defendant believed. See id.

Gehringer cannot simply litigate the "wisdom or accuracy" of Defendant's termination decision; the Court is interested in whether Defendant's decision was an "honest one." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002). "[I]f the employer acted on its honestly-held belief that the employee had engaged in misconduct, even if it was mistaken, there is no discrimination." East v. Clayton Cnty., Ga., 436 F. App'x 904, 912 (11th Cir. 2011). An employee may be fired "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).

The Court will not "second-guess as a kind of super-personnel department" the employer's decision following an internal investigation. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000). The Court's inquiry is limited to whether the employer's "choice is an honest choice," *i.e.*, whether the employer acted in good faith and had reasonable grounds to believe the disciplined employee engaged in the misconduct. *Id.*

The evidence here shows that after the internal investigation prompted by the multiple complaints against Gehringer, Defendant determined that he was, among other things, unmanageable, disruptive, intimidating, not a team player, and untrustworthy. ECF No. 27-1 at 101. Gehringer has failed to show any reason why Defendant would not honestly consider him a nightmare employee, cut from the same cloth as Herman Melville's Bartley, the Scrivener. Herman Melville, *Bartleby, the Scrivener: A Story of Wall-street*, 2 PUTNAM'S MONTHLY: A MAG. OF LITERATURE, SCI., AND ART, Nov. & Dec. 1853, at 547-57, 609-15, *available at* http://www.bartleby.com/129/.

Lastly, the Court notes that even if Gehringer could establish a *prima facie* case of retaliation in this matter, he has not demonstrated that Defendant's explanations for its actions were pretext for retaliation. "The defendant's burden at the rebuttal stage, which is one of production, rather than proof, is 'exceedingly light.'" *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 3101791, at *9 (S.D. Fla. July 25, 2011) (quoting *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)). Defendant has satisfied its burden of production.

As discussed *supra*, Defendant sets forth a slew of legitimate, non-discriminatory reasons for terminating Gehringer. He had a long history of documented misconduct during his tenure in Defendant's employ. Gehringer's misdeeds culminated with a fresh deluge of complaints about him— beginning with his inappropriate and disrespectful comments to co-workers and managers based on what he perceived as gender discrimination in Defendant's cross-training policy, and continuing up until Defendant's decision to terminate Gehringer. Based on this barrage of new complaints about Gehringer, Defendant decided to terminate him.

"Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet [each] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771

(11th Cir. 2005). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head." *Holifield*, 115 F.3d at 1565.

For the reasons discussed *supra*, the Court concludes that Gehringer has failed to rebut the reasons set forth by Defendant for his termination and establish pretext. Gehringer has also not shown that Defendant did not honestly believe that he was unfit, for non-discriminatory reasons, to continue as an employee. The Court reiterates that it is not a "super-personnel department," and it is not the Court's role to question the wisdom of an employer's decision. Whether Gehringer was a good employee and whether Defendant made a bad decision is irrelevant as long as the termination was not made for discriminatory reasons. Gehringer fails to show any discriminatory reason.

## IV. CONCLUSION

Accordingly, Defendant's motion for summary judgment, ECF Nos. 5; 21, is *GRANTED*. The clerk is directed to enter judgment against Gehringer and close this case.

This 20 day of March, 2013.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA